

**07 CV 11346**

JAMES A. SAVILLE, JR. (JS-4835)
KIPP C. LELAND (KL-0932)
HILL RIVKINS & HAYDEN LLP
Attorneys for Plaintiff

45 Broadway, Suite 1500
New York, New York 10006
(212) 669-0600

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------X

TREXEL OIL S.A.,                              : Index No.: 07 cv____ (  )

             Plaintiff,              :

- Against -                                   :    **VERIFIED COMPLAINT**

COMPAGNIE ABIDJANAISE DE                      :
REPARATIONS NAVALES ET DE                     :
TRAVAUX INDUSTRIELS,                          :

             Defendants.             :

-----------------------------------X

    Plaintiff, Trexel Oil S.A., by and through its attorneys, Hill Rivkins & Hayden LLP, as

and for its Verified Complaint against the above-named defendant alleges upon information and

belief as follows:

    1. This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal

Rules of Civil Procedure and this Court has jurisdiction pursuant to 28 U.S.C. §1333.

2. At and during all material times hereinafter mentioned, plaintiff, Trexel Oil S.A., was and now is a foreign business entity organized and existing by virtue of foreign law with an office and place of business at Panama City, Panama and was and now is the owner of the M/V VENUS.

3. At and during all material times hereinafter mentioned, defendant COMPAGNIE ABIDJANAISE DE REPARATIONS NAVALES ET DE TRAVAUX INDUSTRIELS (hereinafter referred to as "CARENA Shipyard") was and now is a foreign business entity organized and existing by virtue of law with an office and place of business at 01 BP 453, Abidjan, Ivory Coast (Côte d'Ivoire) and owned and operated a shipyard in the Ivory Coast.

4. This action is brought to obtain jurisdiction over defendant and to obtain security for any judgment that is eventually entered against the defendant.

5. Pursuant to certain arrangements between the parties, in or about August 2004, the M/V VENUS arrived at the CARENA Shipyard, Ivory Coast for repairs.

6. On or about August 5, 2004, while at drydock to undergo a bottom survey, painting and overhaul of various valves by Carena personnel, an explosion occurred on the M/V VENUS.

7. The explosion aboard the M/V VENUS was caused by the negligent and/or grossly negligent acts and/or omissions of CARENA Shipyard, its agents, employees and/or

representatives, including, but not limited to, performing unauthorized hot-work aboard the M/V VENUS in the vessel's pump room adjacent to an open fuel tank.

8. Following the explosion, Salvage Association surveyors retained by the Hull &Machinery underwriters of the vessel attended aboard to assess the extent of the damage. A true and accurate copy of Report prepared by the Salvage Association surveyor that attended aboard the M/V VENUS is attached hereto as Exhibit 1.

9. Repairs to the M/V VENUS caused by the explosion amounted to $999,715.00. A true and accurate copy subrogation receipt evidencing payment of these damages is attached hereto as Exhibit 2.

10. By reason of the premises, plaintiff Trexel Oil S.A. has sustained damages, as best as now can be calculated, in the amount of $999,715.00.

11. After investigation, defendant CARENA Shipyard cannot be "found" in this District for purposes of and as delineated in Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. Plaintiff is informed that defendants have, or will shortly have, assets within this District, including but not limited to, cash, funds, escrow funds, credits, wire transfer, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and sub-charter hire, at or being transferred and/or wired to, from or through JPMorgan Chase Bank; Citibank N.A.; American Express Bank, Ltd; Bank of America; Bank of New York; Deutsche Bank; HSBC; BNP Paribas; Wachovia Bank; ABN

Amro; Standard Chartered Bank; Bank of Communications; The Bank of East Asia; Bank of China; Shanghai Commercial Bank Ltd, Bank of India and/or any other garnishees as further investigation may uncover.

 **W H E R E F O R E**, plaintiff Trexel Oil S.A. prays:

1. That process in due form of law according to the practice of this Court may issue against defendant COMPAGNIE ABIDJANAISE DE REPARATIONS NAVALES ET DE TRAVAUX INDUSTRIELS citing them to appear and answer the foregoing, failing which, a default will be taken against them for the principal amount of the claim, plus interest, costs and attorneys' fees;

2. That if defendant COMPAGNIE ABIDJANAISE DE REPARATIONS NAVALES ET DE TRAVAUX INDUSTRIELS cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, that all assets of defendant COMPAGNIE ABIDJANAISE DE REPARATIONS NAVALES ET DE TRAVAUX INDUSTRIELS up to and including $999,715.00 be restrained and attached, including but not limited to cash, funds, escrow funds, credits, wire transfer, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, at or being transferred and/or wired to, from or through JPMorgan Chase Bank; Citibank N.A.; American Express Bank, Ltd; Bank of America; Bank of New York; Deutsche Bank; HSBC; BNP Paribas; Wachovia Bank; ABN Amro; Standard Chartered Bank; Bank of Communications; The Bank of East Asia; Bank of China; Shanghai Commercial Bank Ltd., Bank of India and/or other garnishees upon who a Writ of Maritime Attachment and Garnishment may be served; and

3. And for such other and further relief as this Court may deem just and proper.

Dated: New York, New York
December 17, 2007

HILL RIVKINS & HAYDEN LLP
**Attorneys for Plaintiff**

By:_____
James A. Saville, Jr. (JS-4835)
Kipp C. Leland (KL-0932)

45 Broadway, Suite 1500
New York, New York 10006
(212) 669-0600

29710/VERIFIED COMPLAINT

## <u>VERIFICATION</u>

I, Kipp C. Leland, hereby affirm as follows:

1. I am an associate of the firm Hill Rivkins & Hayden LLP, attorneys for plaintiff Trexel Oil S.A. I have prepared and read the foregoing Verified Complaint and know the contents thereof and, the same is true to the best of my knowledge, information and belief.

2. The sources of my knowledge, information and belief are documents provided by our clients and our discussions with them.

3. As plaintiff is a foreign business entity and none of its officers is located in the Southern District of New York, this verification is made by me as counsel of record.

I hereby affirm that the foregoing statements are true and correct.

Dated: New York, New York
      December 17, 2007

                              _____
                                Kipp C. Leland (KL-0932)

# THE SALVAGE ASSOCIATION

Pièce n°
12

## "VENUS"
## GSS No.246281 / SLR
### Advice No.1

| | |
|---|---|
| **Type of policy/instruction:-** | H&M |
| **Instruction date:-** | 06-Aug-04 |
| **Vessel name:-** | Venus |
| **Owners name:-** | Trexel Oil S.A. |
| **Port of registry:-** | Phnom Penh |
| **IMO number:-** | 7921306 |
| **Year built/GT/DWT:-** | 01 Jan 1980/3491/5479 |
| **Classification Society:-** | Columbus American Register |
| **Flag:-** | Cambodia |

| | |
|---|---|
| **Attending Surveyor:-** | Kelvin Euridge, Staff Surveyor |
| **Contact Details:** | +44 7789003813 |

| | |
|---|---|
| **Surveyed at:-** | Abidjan |
| **Date:-** | 12 to 14 October 2004 |

| | |
|---|---|
| **Date of casualty:-** | 05-Aug-04 |
| **Nature of casualty:-** | Explosion in Pumproom and No.2 FO DB tank |

### Brief description & extent of damage:-

The current Owners took delivery of the vessel from Cuban interests in mid 2003 and sailed the vessel to Lagos roads, off Nigeria, where the vessel remained until June this year.
On June 24 2004 the vessel relocated at Carena Shipyard in Abidjan, Ivory Coast in order to undergo refit and drydocking prior to commencing trading along the West African coast.

The vessel was placed into a floating drydock on the 2 August 2004 in order to undergo a bottom survey, painting and overhaul of ships side valves. While in drydock an explosion occurred in the vessel's pumproom allegedly as a result of unauthorised hot-work being carried out by the Shipyard, adjacent to an open fuel tank.



The Salvage Association is a trading style of BMT Salvage Limited

Member of the BMT group of companies
Registered Office: Orlando House, 1 Waldegrave Road, Teddington, Middlesex, TW11 8LZ, UK
Registered in England No. 4147467

A preliminary inspection was undertaken a few days after the explosion in Abidjan but at this time it was not possible to enter no.2 double bottom fuel tank, from which the explosive gas originated. Neither was it possible to access the tanks adjacent to fuel tank.

On 20 August the vessel left the drydock and was moored alongside at the Shipyard to complete ongoing repairs finally departing the Carena Shipyard for the Abidjan anchorage on 27 August 2004.

Commencing the 28 August the vessel was towed to Tema in Ghana by the tug "Isis" and on the 2 September 2004 the vessel anchored in Tema roads awaiting a berth at the PCS Shipyard Tema where tank cleaning was to take place.

Tank cleaning got underway on 20 September 2004 and to date is ongoing. In addition to no.2 fuel oil tank it is intended that all other double bottoms are to be cleaned at this time.

The vessel moved back out to the Tema anchorage on 6 October not returning alongside until 9 October 2004 from which time a further attendance was arranged.

**Damage Found and Repairs Recommended.**
The Salvage Association first inspected the vessel on 12, 13 & 14 August 2004 in Abidjan. Please refer to report GSS 246071, issued week 34/04
A further full inspection of the vessel was made and the following relevant damage noted within no.2 fuel oil double bottom tank, which was initially closed and partially filled with fuel oil.
Additional internal damage to the tank was noted in the form of buckling of the two longitudinal oil tight bulkheads running forward of frames 62 on the portside and 59 on the starboard. The calculated weights of steel renewal require was around 3000kg.
As well as the damage in no. 2 fuel oil tank some other items of equipment are alleged to have suffered damage as a result of the fire and fire fighting activities and these too were surveyed.
In order to complete repairs to no. 2 fuel oil tank the vessel will require dry-docking.

**Nature and estimated time for repairs:-**
With the work of cleaning and gas freeing of adjacent tanks continuing it is not possible to obtain an reasonable estimate of the repair time but as a rough guide completion of cleaning should not take longer than one week. The cropping, renewal, testing, cleaning and coating of damaged steel, which will presumably be on the critical path, should be completed in under six weeks.

**Estimated Cost:-**                              **USD 300 000**

**Status of repairs:-**
Permanent repairs are ongoing.

**Remarks :-**
It is alleged by the vessel's Owner that the explosions, fire and resulting damage that occurred on the motor tanker "VENUS", between 0930 and 1600hrs on 5 August 2004, listed above, occurred as a direct result of representatives from Carena Shipyard undertaking unauthorised hotwork in the restricted confines of the vessel's pump room adjacent to the open fuel oil doublebottom tank no.2.

Attending Surveyor
15 October 2004

# THE SALVAGE ASSOCIATION

| | |
|---|---|
| INSTRUCTION DATE: | 5 August 2004 |
| GSS NUMBER: | 246071 |
| DATE: | 18 August 2004 |

# THIS IS TO CERTIFY

that at the request of the Atlantic Oil Maritime S.A. and on behalf of interests concerned, a survey was held on the steel built, twin screw, motor bunkering tanker

## "VENUS"
### 3491 gross tons of Phnom-Penh, Cambodia

whilst lying afloat alongside at the Carena Shipyard, Abidjan, Cote d'Ivoire for the purpose of ascertaining the cause, nature and extent of damage alleged to have been sustained under the following circumstances:

## 2 AUGUST 2004 – PUMPROOM /DOUBLE BOTTOM TANK EXPLOSIONS

On the morning of 5 August 2004 the M.T. "Venus" was high and dry within the floating drydock of Carena Shipyard, Abidjan when at between 0930 and 0940 the Master was alerted to an explosion that appeared to come from the pumproom.

After the safe evacuation of three shipyard workers a second explosion occurred, causing injuries to three of the ships staff and a technician employed on board.

Two rig tenders/tugs, "Maas Bank" and "Terry Tide" which had been moored adjacent to the "Venus", had managed to deploy, moved alongside the drydock and preceded to drench the vessel from fire monitors putting the fire out but not before a further five explosions occurred.

A Note of Protest was issued by the vessel's Master to the Shipyard holding them responsible for the explosions and charging them with all repair costs resulting from them.

For further particulars please refer to log books, statements on the Note of Protest, the foregoing being based on verbal statements made to us by a representative of the Owners. The log books were sighted on this occasion and copies of the relevant sections are held on record.



The Salvage Association is a trading style of BMT Salvage Limited

Member of the BMT group of companies
Registered Office: Orlando House, 1 Waldegrave Road, Teddington, Middlesex, TW11 8LZ, UK
Registered in England No. 4147467

**"VENUS" REPORT**
GSS No.246071

---

## 12,13 & 14 AUGUST 2004

On these occasions, the undernamed attending surveyor proceeded to the Abidjan, where in company of the vessel's Superintendent, Master and Chief Engineer found and was advised as follows: -

**Vessel Details**

The M.T. "Venus" is an all steel motor tanker with 10 cargo tanks originally epoxy coated to enable the carriage of oil or chemicals, each fitted with heating coils and arranged forward of the accommodation and machinery spaces. The parallel body of the vessel is constructed with centre and outer double bottom tanks designated for the carriage of fuel oil on the centre tanks and water ballast on the outer. A slop tank is provided at the fore-end of the cargo tanks.

The vessel was constructed by Higaki Zosen and delivered to owners as the M.T. "Snowhill" in January 1980.

The cargo pump room housing four diesel driven cargo pumps is situated aft of the cargo compartments and forward of the machinery spaces. The pumps' prime movers, two Yanmar 4 stroke diesel engines, are located through an A60 watertight bulkhead in the machinery spaces and mechanically coupled in pairs via clutch and gearboxes through bulkhead transition glands.

The vessel's main propulsion is provided by a Mitsubishi 6UET45/75C, six cylinder diesel engine producing 2784 kW and directly coupled via intermediate shafting to a four bladed fixed pitch propeller.

Auxiliary three-phase electrical power is supplied at 440 volts, 60 hertz to a main synchronised switchboard located in the machinery control room by two four stroke diesel engines.

The remaining principal particulars are as follows:

|                   |   |                    |
|-------------------|---|--------------------|
| Flag State        | : | Vietnam            |
| Owners            | : | Trexel Oil S.A. Panama |
| IMO Number        | : | 7921306            |
| Delivery Date     | : | 01 Jan 1980        |
| Gross Tonnage     | : | 3491tons           |
| Net Tonnage       | : | 1796 tons          |
| Deadweight        | : | 5479 tonnes        |
| Length overall    | : | 101.66m            |
| Length BP         | : | 95.84 m            |
| Breadth extreme   | : | 15.51 m            |
| Depth moulded     | : | 7.22 m             |
| Main Engine       | : | Mitsubishi         |
| Main Engine Output| : | 2794               |



*Page 2*

"VENUS" REPORT
GSS No.246071

---

## Recent History

The current Owners took delivery of the vessel from Cuban interests in mid 2003 and sailed the vessel to Lagos roads, off Nigeria, where the vessel remained until June this year. On June 24 2004 the vessel relocated at Carena Shipyard in Abidjan, Ivory Coast in order to undergo refit and drydocking prior to commencing trading along the West African coast.

## Chronology of Events

### 2 August 2004

The vessel was delivered to the Yard with the cargo spaces certified as being gas free.

The vessel remained alongside on a wet berth at the yard until 2 August 2004 when it was put into a floating dock to undertake underwater work and refurbishment of the hull coatings.

In addition to underwater work the Owner requested that the Shipyard open no.2 centre double bottom tank for emptying and cleaning, a tank which is located beneath cargo tanks 4 & 5 (port and starboard) and the pump room, with a capacity of $210m^3$.
Entry to the tank is either via an access trunk at the forward end of the doublebottom on the starboardside of the raised trunk deck or through a manhole in the tank top of the pumproom.

Prior to the 5 August the shipyard, assisted by the ships staff, removed the manhole door to no. 2 centre doublebottom located in the pump room. The forward access door on deck was in position but not secured.

### 5 August 2004

Part of the underwater work specified while in drydock was the overhaul of the vessel's seachests and shipside valves, a number of which were also located in the pumproom. On the morning of 5 August 2004 three shipyard personnel were engaged in the task of removing the sea suction valve body located more or less adjacent to the open no.2 doublebottom tank. In order to free the nuts holding the valve cover in place a gas torch was being employed.

At the time of docking the vessel's Master had given strict instructions to the Shipyard that under no circumstances was hot work to commence in any part of the vessel without written consent of the Master. On this occasion it is alleged that neither the ship's Superintendent, Master of any of the crew were aware of the activities in the pumproom.
At around 0930 of the morning in question the Chief officer was busy loading new anchor chain with the boatswain and one of the seaman on the forecastle deck. The Chief Engineer was also occupied on the open deck above the pumproom overhauling the cargo pumps, which had been removed from the pumproom for that purpose. The vessel's Superintendent had just arrived at the vessel and was in the vicinity of the gangway located on the portside aft of the manifold while the Master was engaged on the bridge discussing a steering gear problem with a Mr. Demitrios Sirigas, technician brought in by the Owners from Greece.

"VENUS" REPORT
GSS No.246071

---

At between 0930 and 0940 each of these key staff were alerted to an explosion that appeared to come from the pumproom and noticed smoke pouring from the compartments two skylights.

Each of the officers in question upon attending the forward poop deck attempted to discover the cause and extent of the damage and were very soon surprised to see three shipyard workers, apparently unhurt, at the upper flat within the pumproom. Assistance was given to evacuate them from the compartment while the remainder of the assembled crew were despatched to obtain fire extinguishers.

At this time the Master, the Chief Officer and the Greek technician were attempting to discern the seat of the fire, which at this time was considered to be of limited intensity. The Master was of the opinion that it was limited to the upper landings in the centre part of the compartment and emanating from either electrical cabling or a gas hose. A number of foam and CO2 extinguishers were quickly dispensed from the poop deck into the area of the incandescence with little effect. As the vessel was high and dry the ships fire pumps could not be employed and there appeared to be no pressure on the shipyards fire main.

Attempts were made to run a fire hose from the hydrant on the quay wall but the water pressure was so derisory they were considered to be of no value. Simultaneously two of the ship's engineers were dispatched to disconnect the cooling water supply provided for the ships air conditioning plant. This took some time and when achieved the water pressure was also found to be of little value in fighting the fire.

At this time, although reports as to the actual period vary, a second explosion occurred similar to the first. The blast caught the personnel looking over the skylight coaming trying to assess the damage and ascertain the presence of any further workmen unawares causing burns to the upper bodies of the Master, Chief Officer and the Greek technician. The Chief engineer who was trying to free the pumproom door on the port side of the forward poop was also caught and suffered facial injuries.

Following the second explosion the Master noted that the fire was now taking hold within the pump room and with no effective means to fight the fire ordered all personnel off the ship. He himself remained on board and went to his cabin to retrieve ships documents.

The vessel's Superintendent being unable to get close to the area of the pumproom skylight had gone ashore in an attempt to muster assistance from the shipyard. Finding this unsuccessful he then concentrated on providing a means of evacuation for the crew who were stranded on the ship being unable to reach the gangway.

At some stage during events the blasts had thrown the manhole door off of the forward access trunk to the no. 2 double bottom fuel tank and the blasts had started a fire in the area of the manifold effectively cutting off crewmembers that had been employed in tank cleaning duties in the fore part of the vessel. Similarly engineroom staff were unable to access the gangway and were stranded on the after end of the vessel.

The stranded personnel were evacuated using the shipyard crane, with the Master being the last to leave but not before a third explosion had occurred.

*Page 4*

**"VENUS" REPORT**
GSS No.246071

---

At around this time two rig tenders/tugs, "Maas Bank" and "Terry Tide" which had been moored adjacent to the "Venus", moved alongside the drydock and preceded to drench the vessel from fire monitors.

About one hour after the first explosion two municipal fire tenders arrived and made preparations for the forming of search and rescue party. At this stage it was uncertain if any people remained either in the accommodation of in the lower levels of the pumproom. None of the ships staff knew the whereabouts of three men who had emerged from the pumproom after the first explosion and as such could not query them as to whether they constituted the whole party.

Reported events at this stage become confused, but the Master and the other injured parties were taken to hospital for burn treatment but not before a forth explosion. In total it appears there were seven explosions through the course of the morning and early afternoon the final one being about 1430hrs.

The search and rescue crew undertook a patrol of the pumproom accommodation and machinery spaces completing this and giving the all clear by about 1530hrs

The tugs remained alongside for the whole time providing the only effective firefighting measures, drenching the pumproom and accommodation for the duration, finally departing at around 1530hrs after the all clear was given.

At about 1600hrs the Superintendent and the Shipyard manager. Mr. Lamezon attended the vessel in an attempt to ascertain the extent of the damage though this was aggravated by the presence of surface water in all affected areas.

Ventilation of the various compartments g underway at 1700hrs along with the task of water removal. Through the following six days a watch was maintained by ships staff as indicated in the ship's log, copies of the relevant period have been retain on record.

The Master returned to the vicinity after some three hours to find the situation had stabilised. Permission was granted to the remaining crew to board in order to recover personal effects and where then despatched to hotel accommodation within Abidjan. The Master and Mr. Sirigis were retained in hospital as they were during the period of this survey. The Chief Officer and Chief Engineer received treatment as out patients. No knowledge of the three shipyard workers was forthcoming while investigating the circumstances.

On the following day the Master issued a Note of Protest to the Shipyard holding them responsible for the explosions and charging them with all repair costs resulting from them. A copy of this document is held on record along with reports from the Superintendent the Master and all crewmembers on board at the time.

In order to provide a valid and impartial assessment of the damage sustained as a result of the explosions and ensuing fire the Owners instructed the Shipyard to cease all activities aboard the vessel, other than preservation work, until such a time as such a survey could be arranged.

*Page 5*

"VENUS" REPORT
GSS No.246071

---

## Damage Found and Repairs Recommended.

The Salvage Association inspected the vessel on 12, 13 & 14 August 2004, the Owners having restricted access to the vessel prior to this. Other than preservation work no other work had taken place since the commencement of the casualty.

A full inspection of the vessel was made and the following relevant damage noted with the exception of the no.2 fuel oil doublebottom tank, which was at the time survey closed and partially filled with fuel oil.

**Found**

**Cargo tanks**

Cargo tanks no. 3, 4 and 5 (port and starboard) were inspected as these tanks form boundaries with no. 2 doublebottom fuel oil tank, thought to be the centre of the subject explosions.

Tank structures found to generally to have no related damage, though oil residues were noted on the tank bottom. The tanks were reportedly clean at the time the vessel was presented for docking.

The access trunking to no. 2 fuel oil double bottom tank at the forward bulkhead of no 4 port cargo tank was found buckled for the entire height and width of the trunking.

**Recommended**

*It is recommended that no. 2 fuel oil double bottom tank be hydrostatically tested and a further inspection made to verify the integrity of the tanks' boundaries below the cargo tanks.*

*The access trunking to no. 2 fuel oil double bottom tank at the forward bulkhead of no 4 port cargo tank should be cropped out renewed and tested. Allow for 1.2mm x 7.25m x 1.0m x 8mm on three aspects...say 1500kg o steel renewal.*



**"VENUS" REPORT**
**GSS No.246071**

---

**No.2 fuel oil doublebottom**

No.2 fuel oil doublebottom was at the time survey closed and partially filled with fuel oil.

It should be noted that as this tank was at the centre of the explosions there is a real possibility that it may have sustained internal damage.

An external survey of the tank margins was undertaken and where relevant comments made for the compartments were damage was noted.

The vessel's underwater area in way of the subject tank was inspected and no relevant damage noted.

*It is recommended that this tank be drained, cleaned, rendered gas free in order that a full internal inspection can be undertaken.*

**Main and trunk decks**

Being in way of the forward access trunk to no. 2 fuel oil double bottom tank the deck, derrick and piping manifold were superficially fire damaged. No structural damage was noted other than that to the manhole door that was throw off during the early explosions.

The manifold derrick was found to have suffered damage to the rigging and the derrick winch which sits over the access trunk, was affected.

*It is recommended that no. 2 fuel oil double bottom tank access door be renewed.*

*That the damaged rigging on the derrick be replace and that the derrick winch be load tested as verified as being operational.*

*All coated surfaces are to be degreased, high pressure washed and recoated in accordance with the original paint specification*



**"VENUS" REPORT**
**GSS No.246071**

---

**Forward Poop Weather Deck**

Skylights

The deck above the pumproom was found to be more or less unaffected however the two sets of double skylights are set on coamings on this deck. The starboard skylight was removed prior to the casualty and though damaged this was considered not casualty related. The port skylight suffered damage to the port glasses and coating.

*It is recommended that the port skylight should be fully overhauled with replacement glasses and tested for structural deformation. All coated surfaces are to be degreased, high pressure washed and recoated in accordance with the original paint specification*

Companionway to Pumproom

In order to gain unrestricted access to the pumproom during the incident the access door was removed.

The companionway is fitted with a mushroom vent that was found removed but other wise undamaged.

The companionway was otherwise only superficially damaged.

*It is recommended that the access door be reinstated tested for water-tightness and structural deformation.*

*The mushroom vent is to be reinstated.*

*All coated surfaces are to be degreased, high pressure washed and recoated in accordance with the original paint specification.*

Deckhouse front

The deckhouse front was noted as having suffered superficial damage to the coatings as a result of the smoke and flames. No structural damage was noted.

*On completion of all work the whole accommodation front is to be thoroughly cleaned, degreased and coated in accordance with the original painting specification. Allow 8 * * * surface area. and for cutting * * the "No Smoking" and "Safety + First * tting"*

**"VENUS" REPORT**
**GSS No.246071**

---

**Pumproom**

**Main Deck Level**

The following fixtures and fittings were noted at this level all of which were effected by the fire.

- Foam storage tank with pump and tank alarm.
- Compartment extractor fan,
- Two explosion proof light fittings.
- Trunking and air plenums.
- Ladders and staging.

*It is recommended that ...*
*The wiring for the foam storage tank ancillaries be renewed in accordance with the original wiring specification and tested as being fully operational. The tank contents are to be removed and the tank replenished.*

*The lighting is to be completely renewed with unbroken cable runs and approved light fixtures.*

*The extractor fan should be overhauled and verified as being fully operational. Note that the fan motor is on the other side of the A60 engineroom bulkhead and was not affected.*
*All air trunks is to be checked as being air tight and structurally sound*

*All ladders and staging is be verified as being in sound safe condition and if wanting replaced.*



**"VENUS" REPORT**
GSS No.246071

---

Lower platform

The pumproom lower level houses
Four cargo pumps and filters, three of the
cargo pumps were removed at the time of
the incident, the forth (port side inner)
remained,

- Seawater pump,
- Shipside valves,
- Bilge level alarm,
- 4 light fitting,
- Air trunking
- Ladders and staging.

As with the upper level there was a
quantity of debris and clutter throughout
having resulted from the firefighting effort
and water damage.
Most damage sited was superficial with
the exception of the light fitting and the
after bulkhead.

The after engineroom bulkhead was found
to be more or less buckled over the entire
height and to a width of some 5m with
deformation in the region of 60mm in the
worst effected areas.
The light fittings and associated wiring
were destroyed.
The bilge alarm was apparently unaffected
other than damage to the supply cabling.
No damage was noted to the seawater
valves, or the remaining pumps.
The remains of oxy-acetylene burning
torch was noted adjacent to the sea suction
bottom valve that had been dismantled and
the body of which was partially
disconnected from the associated piping
and shell mounting. The valve was
approximately 1.5 m away from the
manhole door to no.2 double bottom fuel
tank. The door to the tank had been
replaced.

*It is recommended that...*
*All of the wiring for the float alarm and
lighting be renewed with uninterrupted
cable runs in accordance with the original
wiring specification and tested as being
fully operational.*
*The lighting is to be completely renewed
with approved light fixtures.*
*The remaining pumps should be
overhauled and verified as being fully
operational. Note that the pump motor is
on the other side of the A60 engineroom
bulkhead and was not affected.*
*All air trunks are to be checked as being
air tight and structurally sound.*

*All ladders and staging is be verified as
being in sound safe condition and if
wanting replaced.*

*The A60 engine bulkhead should be
cropped out and renewed with due
consideration being paid to any
insulation, fixtures and fittings within the
engineroom. A steel allowance of some
7.5m x 5.0m with a plating thickness of
say 8mm thickness and total mass 2.5
tonnes.*

*Provision should be made for restricted
access and the possibility of asbestos
being present as insulation.*

*The bulkhead will require testing to the
satisfaction of class on completion.*

*On completion of all work the inside
compartment is to be thoroughly cleaned
of debris, degreased and coated in
accordance with the original painting
specification.*

*Page 10*

**"VENUS" REPORT**
GSS No.246071

---

### Safety Equipment Store

This store located starboard out board of the pumproom was found to be in a state of disarray and partially flooded as a result of firefighting activities on the part of the assisting tugs.

No inventory of the damaged equipment within the store was provided at the time of the survey

*It is recommended the compartment is to be pumped dry and on completion of all work thoroughly cleaned of debris, degreased and coated in accordance with the original painting specification.*

*Should any highly valued equipment be damaged as a result of the firefighting this should be brought to the attention of the Salvage Association who will consider whether a further survey is warranted*

### Accommodation

The vessels accommodation arranged on three decks namely

Poop Deck
Boat Deck
Captain Bride deck

Water damage occurred throughout he accommodation resulting from firefighting activities.

All accessible cabins were inspected and floor covering throughout were noted as having been effected.

The ship's crew were given the opportunity to declare any damaged personal effects in order that these claims could be ratified.

*It is recommended*

*All effected accommodation floor cover be removed from the vessel and renewed with like following suitable preservation work . The effected areas allowed for include*

| | |
|---|---|
| *Poop deck* | *137m²* |
| *Boat deck* | *78m²* |
| *Captains deck* | *62m²* |

*In view of the amount of water flowing through the accommodation during firefighting activities it is recommended that a full inspection be made of deck head wiring and that electrical insulation tests be undertaken on all circuits running through the accommodation. Any defective circuits are to be cropped out and replaced in accordance with the ships original wiring specification*

"VENUS" REPORT
GSS No.246071

---

## Wheelhouse

- During firefighting activities the wheelhouse was badly affected by water spray resulting in damage to a greater of lesser degree to most of the navigation and control equipment contained therein.

An inventory of this equipment included the following…

The wheelhouse structure was also noted as having suffered in so much that two side window were found shattered on the starboard side and that the deck floor cover was water logged.

*It is recommended that all navigational instruments be checked by a suitably qualified technician and where found defective consideration given to either repair or replacement. Should replacement be considered then further consultation with the Salvage Association should follow supported by full service reports and competitive quotations for the replacements.*

*The window glasses for the starboard side windows should be replaced. Allow two armoured glass windows 500mm x 500mm.*

*The floor covering should be removed and replaced in accordance with the shipbuilder's original specification.*

*The magnetic compass should be checked by an authorised service agent and adjusted on completion of all works.*

*All navigation lighting, engine control wiring and inter-ship communication systems should be insulation tested and low readings rectified.*

## Bridge Equipment

| Equipment | Manf. | Type | Comments |
|---|---|---|---|
| Radar | JRC | JMA-250 | Apparently unaffected |
| Radar | JRC | Rasterscan, JMA 3810 | Apparently unaffected |
| Autopilot | Hokashin | | Apparently unaffected |
| Echosounder | JRC | NJA 1935 | Apparently unaffected |
| GPS | Koden | | Apparently unaffected |
| Gyrocompass | Hokashin | | Apparently unaffected |
| Navtex | | | Apparently unaffected |
| Inmarsat | Nera | | Apparently unaffected |
| Inmarsat, fax and printer | Cannon | L220 | Apparently unaffected |
| VHF (port) | JRC | JHS 32A | Irreparably damaged |

*Page 12*

**"VENUS" REPORT**
GSS No.246071

| Equipment | Manf. | Type | Comments |
|---|---|---|---|
| VHF (star) | JRC | JHS 32A | Apparently unaffected |
| GMDSS | JRS | | Irreparably damaged |
| Inmarsat | JRS | JUE-75A | Irreparably damaged |
| Controller | JRS | NCH 802 | Irreparably damaged |
| Power unit | JRS | | Irreparably damaged |
| Connecting box | JRS | NQE-3030 | Irreparably damaged |
| Monitors (2) | JRS | ND" 127C | Irreparably damaged |
| Printers (2) | JRS | | Irreparably damaged |
| Keyboard (2) | JRS | | Irreparably damaged |
| Photocopier | Cannon | | Irreparably damaged |
| Binoculars | | | Irreparably damaged |
| Navigation lighting | | Installation | Apparently unaffected |
| Engine control stand | | Installation | Apparently unaffected |
| Nautical publications | | BA | Apparently unaffected |
| Charts | | BA | Apparently unaffected |

**Refrigerated stores**

At the time of the casualty and for the week following it was not possible to supply power to the vessel. As a result of this the ships entire refrigerated and perishable store have been condemned.

*It is recommended that the store be suitably disposed of and replenished.*

**Electrical Circuits**

As a result of the deluge suffered within the accommodation and adjoining compartments all electrical circuits will have be affected to a greater of lesser degree.

*It is recommended that a full set of insulation reading be undertaken for all wiring circuits and all low values be rectified. This recommendation applies only to supply cabling.*
*Should any plant or appliance be showing low insulation values the Salving Association should be further consulted before proceeding with repairs or replacements*

*Page 13*

**"VENUS" REPORT**
GSS No.246071

---

### Machinery Spaces

The accumulation of water resulting from firefighting activities is thought to have had a minimal effect on the machinery spaces and no apparent damage to plant of control equipment was noted, however smoke damage is noted to have occurred within the vicinity of the A60 bulkhead 35. Causing staining of all surfaces. Concern was also expressed that the water may have entered the two generators which were undergoing routine maintenance at the time.

*It is recommended that all accumulated water is pumped from the machinery space bilges and that the bilges are cleaned.*

*All smoke effected, coated surfaces are to be degreased, high pressure washed and recoated in accordance with the original paint specification.*

*The ships two generators are to carefully checked, washed out with electrical cleaner and insulation readings taken. Any further repairs are to be brought to the attention of the attending survey prior to proceeding.*

### Steering Flat

The accumulation of water resulting from firefighting activities is thought to have had a minimal effect on the steering gear compartment and no apparent damage to plant of control equipment was noted.

*It is recommended that all accumulated water is pumped from the bilges and that the bilges are cleaned.*
*The steering machinery is to be verified by ships staff as being fully operational.*

### Other Weather Decks, including bridge Wings and Monkey Island.

None of the exposed decks captioned were noted as having suffered as result of the incident other that minor smoke damage to the monkey island.

However it was noted that the electrical lamp locker of the after end of the Captains deck was flooded by water entering from an open vent on the monkey island. All stores held within were found to be waterlogged and have no further use.

*It is recommended that a small quantity of paint be provided to make good any incidental smoke damage not quantified, to a maximum of 10litres.*
*Equipment in the electrical locker should be suitably disposed of and replaced A small number of similar compartments were not available for inspection as they were locked.*
*If any of these spaces suffered loss of stores or spares then further consultation with the Salvage Association should be sought and the damage surveyed as seen fit.*

*Page 14*

**"VENUS" REPORT**
GSS No.246071

**Firefighting Appliances.**

A number of the ships firefighting appliances were spent during the firefighting operations.

*It is recommended ...*
*that all appliances used during the operations be fully serviced, and where applicable tested for serviceability, by an approved local service agent. Shipyard regulations in respect to the servicing of ships firefighting equipment should be taking into consideration*

**Permanent Repairs**

Permanent repairs are ongoing in conjunction with completion of the routine aspect of the docking.

The Shipyard as expressed a desire to remove the vessel from dock on completion of the underwater work, in order that the cleaning of no.2 double bottom tank can continue.

We have advised the Owner that if upon inspection of no.2 double bottom fuel tank additional damage is found then a follow-up survey will be required in order to assess this new damage.

It is to be expected that permanent repairs will take the form of the above recommendations and can be expected to take about six weeks.

From the damaged noted at this juncture drydocking is not necessary for these permanent repairs.

**General Access**

The following items should be considered under the category of general access.



- ▫ Transportation provided as necessary
- ▫ Cranage provided for loading/unloading of parts
- ▫ Provision/closing of access hole in the starboard side shell
- ▫ Tanks cleaned and waste oil to be disposed of
- ▫ Ventilation, temporary lighting and access
- ▫ Gas freeing and gas free certification for all hot work
- ▫ Dirt and debris removed and disposed of.
- ▫ Drydocking not required for temporary or permanent repairs

**Additional Working.**

*Page 15*

**"VENUS" REPORT**
GSS No.246071

During the repair period the Owners intends to undertake the following work/surveys

- Overhaul of main engine
- Overhaul of cargo handling equipment
- Annual and intermediate Class surveys
- Load line annual Survey
- Replenishment of hull coatings
- Steelwork repairs
- Tank cleaning

**Overtime Working.**

The Owner has not expressed a desire to work overtime in order to reduce the repair period. If any overtime is undertaken the reduction in costs to the Underwriters that may result will be assessed at the completion of repairs.

**Allegation of Cause**

It is alleged by the vessel's Owner that the explosions, fire and resulting damage that occurred on the motor tanker "VENUS", between 0930 and 1600hrs on 5 August 2004, listed above, occurred as a direct result of representatives from Carena Shipyard undertaking unauthorised hotwork in the restricted confines of the vessel's pump room adjacent to the open fuel oil doublebottom tank no.2.

The damage is reasonably attributable to the cause alleged.

**Accounts**

At the time of compiling this report final accounts had not been completely agreed. When these accounts have been fully agreed they will form the subject of an addendum to this report.

**ISM Documentation:-**

The ISM Document of Compliance was issued to the vessel's Managers by the Lloyds Register on 14 November 2003 and remains valid until 5 August 2004.

The ship's Safety Management Certificate was issued by Global Marine Bureau on behalf of the Cambodian authorities on 10 June 2004 and is valid until 31 August 2004.

**"VENUS" REPORT**
GSS No.246071

**Principal Dates**

| | |
|---|---|
| 24 June 2004 | Entered Carena SY Abidjan |
| 2 August 2004 | Drydocking undertaken, Abidjan |
| 5 August 2004 | Casualty |
| 12-14 August 2004 | Subject survey. |
| 19 August 2004 | Expected to depart drydock |
| 1 October 2004 | Estimated date for completion of permanent repairs |

Kelvin Euridge
Attending Surveyor

Richard Allen
The Salvage Association

**Appendix**

Selected photographs

**Retained on file.**

- Deck log sheets for relevant dates.
- Photographs of the damaged areas and equipment taken during the survey
- Note of Protest issued by Master
- Statements from ships staff
- Copies of vessel trading certificates
- Copies of gas free certificates issue on vessels delivery to Carena Shipyard



*Page 17 of 21*

Exhibit 2



# TREXEL OIL S.A.
## PANAMA CITY – PANAMA

## DISCHARGE AND SUBROGATION FORM

M/V VENUS – Explosion on fire at Carena Shipyard 05 August 2004

On 25 February and 5 April 2004, we the undersigned, TREXEL OIL SA PANAMA represented by ATLANTIC OIL MARITIME SA received payment of the total amount of 999 715 USD as full settlement and final discharge of all claim under the hull and machinery insurance with respect to the damages to the above mentioned vessel. We declare having no other insurance policy covering these damages.

The present is considered as a subrogation in favour of the hull and machinery underwriters whose names are mentioned below, to whom we transfer all our rights and remedies in respect to the subject matter insured and grant full power and to whom we will give any assistance they may reasonably require from us in exercise of such rights and remedies in our name at their own expense.

1) AMLIN CORPORATE MEMBER LTD SYNDICATE 2001
2) SYNDICATE 510 KILN UNDERWRITING LTD
3) SYNDICATE 382 HARDY UNDERWRITING LTD
4) SYNDICATE 33 HISCOX DEDICATED CORPORATE MEMBERS LTD
5) SYNDICATE 958
6) SYNDICATE 609 609 CAPITAL LTD
7) SYNDICATE 2488 ACE UNDERWRITING AGENCIES LTD

If needed this document shall also be considered as an assignment of all our rights to the insurance companies.

Signed and approved

Panama City, June 14th 2007

ANTONIA GONZALEZ PEREZ
PRESIDENT/DIRECTOR

El LCDO. MARCO MURILLO A. Primer Suplente
Notario Público Primero del Circuito de Panamá
con cédula de identidad personal No. 8-219-592
CERTIFICA

Que la(s) firma(s) que aparece(n) en el presente
documento ha(n) sido estampada(s) por el(los)
firmante(s) como suya(s) por consiguiente dicha(s)
firma(s) es son auténtica(s)

Panamá 1 8 JUN 2007 de 20

LICDO. MARCO MURILLO A.
Notario Público Primero
Primer Suplente